[Civ. No. 38712. First Dist., Div. Two. Dec. 6, 1976.]

VERNER P. CARLSEN, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS
BOARD et al., Defendants and Respondents.

**COUNSEL**

Atchison, Haile & Haight, Robert M. Haight and William K. Rentz for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Harold W. Teasdale and Eleanor Nisperos, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**ROUSE, J.**—Plaintiff Verner Carlsen commenced this action to obtain a writ of mandate vacating and setting aside certain administrative decisions which denied his claim for unemployment insurance benefits.[1] The trial court upheld the administrative decisions and rendered judgment denying the writ of mandate. Plaintiff appeals from said judgment.

The facts relevant to this appeal may be summarized as follows:[2] In 1965, plaintiff formed a corporation known as Carlsen, Inc. Plaintiff became president of the corporation, his wife became vice president, and plaintiff's accountant became secretary-treasurer. All of the stock in the corporation was owned by plaintiff and his wife. Shortly after the corporation was formed, the corporate officers discussed the question of whether they should receive salaries for performing their duties as officers. It was decided that none of them would be paid for such services. Plaintiff testified that his wife and his accountant were both

---

[1]The defendants named in the complaint included the California Unemployment Insurance Appeals Board, the individual members of said board, the California Employment Development Department, the director of said department and Carlsen, Inc., which was allegedly plaintiff's last employer.

[2]This factual summary is based upon the evidence produced at a hearing held before a referee of the California Unemployment Insurance Appeals Board.

strongly of the view that the corporation was too small a business and could not afford to pay salaries to its officers.

Subsequent to its formation, Carlsen, Inc., performed general contracting work. In his capacity as president of the corporation, plaintiff spent his weekends and evenings engaging in such activities as bidding on and negotiating contracts for the corporation. Since plaintiff was a carpenter, he worked in that capacity on various contracts where his skills were appropriate. When rendering such services, he was paid union scale carpenter's wages by the corporation. The usual payroll deductions, including unemployment insurance, were withheld from plaintiff's wages. The corporation employed other individuals in addition to plaintiff. For instance, in 1973 there were five or six carpenters on the corporate payroll.

On September 9, 1974, some nine and a half years after Carlsen, Inc., was formed, plaintiff became ill and was hospitalized. He was released from the hospital on September 20, 1974, but could not return to work as a carpenter for the corporation because, at that time, Carlsen, Inc. was unable to obtain any contracts to perform construction work. Plaintiff then applied for other employment as a carpenter through the union hall, but was unable to obtain such work. Thereafter, in his capacity as corporate president, he continued to seek jobs for the corporation, but he testified that all sources of construction work seemed to have dried up. According to plaintiff, he devoted two hours a week, at the most, to his efforts to obtain work for the corporation. Plaintiff testified that if the corporation were to obtain a construction contract where his services as a carpenter could be utilized, he would immediately return to work for the corporation. At the time of the hearing before the referee, Carlsen, Inc. was still in existence, but had no construction workers in its employ and no construction contracts.

Following his unsuccessful attempt to obtain work as a carpenter through the union hall, plaintiff filed a claim for unemployment insurance benefits. The Employment Development Department denied his claim on the ground that, since he was still serving as president of Carlsen, Inc., he was not "unemployed" within the meaning of section 1252 of the Unemployment Insurance Code.

Plaintiff then appealed and obtained a hearing before a referee for the Unemployment Insurance Appeals Board. Based upon the evidence which we have set forth above, the referee affirmed the department's

determination to deny benefits. In his decision, the referee noted that Carlsen, Inc., was still a viable, solvent corporation; that its work was not seasonal, but was controlled by the demands of the construction industry and that it had no contracts at present. The referee further noted that, as corporate president, plaintiff was spending at least two hours a week attempting to obtain business for the corporation and that, in addition, it was necessary for him to be prepared at all times to take appropriate action when the affairs of the corporation so required. The referee concluded, therefore, that plaintiff was not "unemployed."

Upon appeal, the Unemployment Insurance Appeals Board adopted the referee's decision as its own.

Plaintiff then commenced this mandamus action. The trial court exercised its independent judgment upon the evidence in the administrative record and made findings which, in most respects, were consistent with the referee's decision. However, the court disagreed with the referee's finding that plaintiff's business was not seasonal, and found, instead, that the construction industry was seasonal. The referee had also found that, after plaintiff could no longer obtain work as a carpenter, he devoted about two hours a week to his attempts to obtain new business for the corporation. However, the trial court found that during the period after he was laid off as a carpenter, plaintiff's duties as corporate president "fully occupied [his] time inasmuch as he had to be prepared at all times to take appropriate action when the affairs of the corporation so required." The trial court also found that the initial decision that the corporate officers would not receive salaries was made by plaintiff, "with the consent of the other corporate officers . . . ."

The trial court concluded as a matter of law that "An individual who devotes his services to a corporation-employer, who must be prepared at all times to take appropriate action when the affairs of the corporation so require, and to whom wages are payable, if the individual permitted the corporation to make such payments to him, is not unemployed within the meaning of section 1252 of the Unemployment Insurance Code"; that "The preponderance of the evidence shows that when [plaintiff] was laid off by Carlsen, Inc., that he continued to devote his full time to the corporation and rendered his services as corporate president for which wages would have been payable had he permitted Carlsen, Inc., to compensate him for such services." The trial court denied plaintiff's application for a writ of mandate.

Plaintiff's initial contention on appeal is essentially as follows: He points out that section 1251 of the Unemployment Insurance Code[3] provides that unemployment compensation benefits are payable "to unemployed individuals who are eligible under this part," and that section 1252 provides in pertinent part that "An individual is 'unemployed' in any week . . . during which he performs no services and with respect to which no wages are payable to him." Plaintiff further points out that section 100, which contains the legislative declaration of policy behind unemployment compensation benefits provides that such benefits are to be paid only to persons "unemployed through no fault of their own . . . ." This fault element also appears in section 1256, which provides that an individual is disqualified for unemployment compensation benefits if he left his most recent work "voluntarily without good cause"; again in section 1257, subdivision (b), which disqualifies an individual who, "without good cause, refused to accept suitable employment when offered to him, or failed to apply for suitable employment when notified by a public employment office."

Plaintiff asserts that both the referee and the trial court indicated in their respective decisions that they had found that plaintiff was not "unemployed" within the meaning of section 1252. He contends that both decisions were based upon a merging of the fault concept with the unemployment requirement. Stated somewhat differently, plaintiff argues that under section 1252, the unemployment issue turns upon the resolution of two basic factual questions: (1) whether plaintiff performed services during a given week and (2) whether wages were payable to him in a given week. He contends that, in this instance, both of these questions must be answered in the negative because, at all times subsequent to his lay-off as a carpenter for Carlsen, Inc., he did not perform any "services," as the term is used in section 1252, and no wages were payable to him. Hence, plaintiff asserts that he was "unemployed" within the meaning of section 1252. Plaintiff argues that both the referee and the trial court erroneously reached a contrary conclusion by reasoning that plaintiff's unemployment was his own fault. He points out that, in reaching such a conclusion, neither the referee nor the trial court acknowledged their reliance upon any of the code sections embodying the fault concept. He further asserts that neither of them correctly resolved the fault question. We have concluded that plaintiff's position is sound.

[3]All code section references hereafter made are to the Unemployment Insurance Code, unless otherwise specified.

■ At the outset, it seems appropriate to point out that the Unemployment Insurance Act is a remedial statute and the provisions as to benefits must be liberally construed for the purpose of accomplishing its objects. (*Garcia* v. *Industrial Accident Com.* (1953) 41 Cal.2d 689, 693 [263 P.2d 8]; *Empire Star Mines Co.* v. *Cal.Emp.Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686].) ■ The Legislature did not intend that the payment or withholding of benefits should turn on nice distinctions in the definitions of words like "employed." (*Matson Terminals, Inc.* v. *Cal.Emp.Com.* (1944) 24 Cal.2d 695, 707 [151 P.2d 202]; see § 100 for the legislative declaration of policy.)

With these rules in mind, we turn to the question of whether plaintiff was unemployed within the meaning of section 1252. It appears evident that he was. We are not persuaded by defendants' contention that plaintiff continued to "perform services" after he was laid off as a carpenter because he spent two hours a week attempting to find business for Carlsen, Inc. Rather do we find that the reasoning of *People* v. *Nest* (1942) 53 Cal.App.2d Supp. 856 [128 P.2d 444], is applicable to the situation before us. In that case, the evidence established that during the period when the claimant was receiving unemployment benefits, he made many attempts to obtain new employment and at the same time opened a clothing business which was operated by his wife and one employee. While continuing at all times to seek work elsewhere, the claimant supervised the clothing store and spent from one to five hours each day and most evenings helping out at the store. After approximately three months, the business proved unsuccessful and the claimant closed it at a financial loss. He testified that his presence at the store had never been necessary for the running of the business and that his activities in connection with the business had never interfered with his efforts to obtain other employment nor his ability to accept such employment had it become available to him.

The court in the *Nest* case held that the claimant's activities in connection with the clothing store business did not constitute the performance of services within the meaning of the Unemployment Insurance Act. The court stated that "while it was the intention of the Legislature to protect the fund created under the act from chiselers, it was not its intention to put a premium on idleness, nor to discourage citizens out of employment from making early and earnest attempts to reestablish themselves economically to avoid becoming or continuing to be charges on society. [¶] . . . The word 'service,' not being defined in the act, must be given its common meaning, unless the context requires

otherwise, which it does not. Merriam-Webster's New International Dictionary defines 'service' as, 'The occupation, condition, or status of a servant.—Performance of labor for the benefit of another, or at another's command;—hired helper;—duty done or required.' Certainly these definitions do not embrace the activities of the defendant in assisting part time in the running of his own clothing establishment. In addition, the defendant's services were not performed for 'wages' nor did he receive any compensation therefor. Likewise he was not under 'any contract for hire,' express or implied. [¶] . . . We are therefore of the opinion that during the period in question the defendant was in a class 'deemed unemployed' by the Unemployment Insurance Act, and that his self-employment activities did not remove him from such class." (Pp. 860-861.)

In this instance, plaintiff devoted far less time than the claimant in the *Nest* case to his efforts to obtain business for Carlsen, Inc. Like the claimant in the *Nest* case, plaintiff was not acting as the servant or helper of another or pursuant to any contract of hire. He received no wages of any kind for his efforts on behalf of the corporation, and this had been the case for some nine and one-half years. At no time did plaintiff cease to look for other employment. He had sought employment through the union. His activities on behalf of the corporation were designed merely to increase the likelihood that he would obtain employment as a carpenter through the corporation and thus would not become or long continue to be a charge on society. We conclude that plaintiff's activities on behalf of Carlsen, Inc., did not constitute the performing of services within the meaning of section 1252.

■ We are also of the opinion that no wages were "payable" to plaintiff, within the meaning of section 1252, after he was laid off as a carpenter. Black's Law Dictionary (rev. 4th ed. 1968) defines "payable" as follows: "Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable. *In re Advisory Opinion to the Governor*, 74 Fla. 250, 77 So. 102, 103. [¶] A sum of money is said to be payable when a person is under an obligation to pay it. 'Payable' may therefore signify an obligation to pay at a future time, but, when used without qualification, 'payable' means that the debt is payable at once, as opposed to 'owing.' Sweet. And see *First Nat. Bank* v. *Greenville Nat. Bank,* 84 Tex. 40, 19 S.W. 334; *Easton* v. *Hyde,* 13 Minn. 91, Gil. 83."

Although defendants urge us to adopt the first part of this definition and hold that wages are "payable," within the meaning of section 1252, whenever they are "capable of being paid" or "suitable to be paid," we do not find this argument persuasive. In view of the liberal construction which must be accorded to a remedial statute such as the Unemployment Insurance Act, we are satisfied that the Legislature intended the phrase "wages are payable" to denote a situation where an employer was under an unequivocal and present obligation to pay wages to his employee pursuant to the contract of hire; hence, wages which are "payable at once" and as to which the employee has a "legally enforceable" right. To adopt defendants' suggested interpretation of the phrase "wages are payable" would render an employee who had lost his job ineligible for unemployment compensation benefits until such time as he had pursued through the courts an unliquidated or even speculative claim against his employer. We are confident that the Legislature intended no such result. We hold that, in the instant case, no wages were "payable" to plaintiff after he was laid off as a carpenter, since there had never been any obligation on the part of Carlsen, Inc., to pay plaintiff for his services as president and such had been the case for nine and one-half years.

We next consider the question of whether the decisions by the referee and the trial court can be upheld on the ground that plaintiff was unemployed through his own fault and for that reason was ineligible to receive unemployment compensation benefits. There are a number of out-of-state cases which have held that an individual who is a corporate officer and holds a controlling interest in the corporation is not unemployed, within the meaning of the unemployment insurance laws, merely because he elects during a particular period of time to receive no compensation. (See *Marvin* v. *Catherwood* (1965) 24 App.Div.2d 924 [264 N.Y.S.2d 665]; *Lodico* v. *Catherwood* (1960) 11 App.Div.2d 873 [203 N.Y.S.2d 492]; *In re D'Angelo* (1960) 11 App.Div.2d 825 [202 N.Y.S.2d 817]; and *Child* v. *Board of Review of Industrial Commission* (1958) 8 Utah 2d 239 [332 P.2d 928].) In *Marvin,* the claimant was an officer and one-half owner of two corporations which were apparently financially successful and in which he had made a substantial investment, and his decision not to receive compensation for his services on behalf of the corporations was apparently a purely arbitrary one. The remaining three cases all involved corporations which were engaged in seasonal occupations where it was readily predictable that the corporate earnings would be great during certain months of the year and extremely lean or even nonexistent during other months. It is implicit in each of these decisions that the corporations involved were successful on a yearly basis and that

it would be unfair to allow an officer with control over such a corporation to pay himself compensation only during the profitable months of the year and arbitrarily classify himself as unemployed, thus becoming eligible for compensation benefits, during the lean months of the year. The reasoning behind these decisions is expressed in *Child* v. *Board of Review of Industrial Commission, supra,* at page 929: "A president of a corporation who is also manager, who has year-round responsibility to operate the business of the corporation and does so, cannot by purportedly laying himself off as manager in those periods when there may be no actual business activity, but when his corporate duties and management activity persist in the pursuit of future or continued business of the company, obtain unemployment benefits. He is much in the same position as a man working on a deferred commission payment basis who certainly cannot be said to be unemployed during the time the commission actually is not paid, but earned."

There appears to be only one California case dealing with the question of whether a corporate officer with control over the corporation may qualify for unemployment compensation benefits. In *Cooperman* v. *Unemployment Ins. Appeals Bd.* (1975) 49 Cal.App.3d 1 [122 Cal.Rptr. 127], the plaintiff, who was a cameraman-director, had formed his own corporation. He was the president and sole shareholder of the corporation, and its sole function was to sell the plaintiff's talents and expertise. The corporation possessed no business or merchandise other than the plaintiff's personal services, and its only assets consisted of $50 in a bank account. The plaintiff received no compensation for his services as corporate president. Those services consisted solely of finding employment for himself. When he did obtain employment through the corporation, he received union scale wages on which the corporation paid all the required taxes, including unemployment insurance. Since the film industry's job market was an erratic one, there were periods when the plaintiff was unemployed and spent his time seeking work on behalf of himself and the corporation. The question before the *Cooperman* court was whether the plaintiff was ineligible for unemployment compensation benefits during one such period.

The *Cooperman* court concluded that the plaintiff was eligible for such benefits, reasoning that the plaintiff and the corporation were in reality one and the same and that the only services which he performed for the corporation between jobs consisted of looking for work, a service performed for himself as well as for the corporation. The court noted that the plaintiff had never been compensated for his services as

president and that he lacked the power to pay himself because the corporation had no assets. The *Cooperman* court distinguished the out-of-state cases discussed above on the ground that they involved seasonal occupations where the corporate officers had significant managerial duties during the "off-season," whereas the plaintiff's inability to find work for himself or the corporation was due to the erratic nature of the motion picture industry and his corporate duties when out of work were extremely minimal. The court concluded that in order to follow the public policy set forth in section 100 of the Unemployment Insurance Code, Cooperman must be considered unemployed. "It would be against the. public policy of this state to declare that he is employed solely because he holds the figurehead title of president of Image when he receives no compensation and performs only *de minimus* services. Section 1252 of the California Unemployment Insurance Code, a remedial statute, must be liberally construed. [Citations.] [¶] '[T]he fundamental purpose of unemployment insurance is to cushion the impact of such impersonal industrial blights as seasonal, cyclical and technological idleness, and thus to provide benefits to workers coming within the provisions of the act for unemployment not occasioned with their consent or brought about by their fault.' [Citation.] The payment of benefits to Cooperman would fulfill the policy and purpose of the act and would not be in contravention of that policy and purpose. Thus, the trial court's decision is supported by the evidence and a different result is not compelled as a matter of law." (P. 10.)

The *Cooperman* case is distinguishable from the instant case in certain respects, since Carlsen, Inc., did possess an existence separate and apart from plaintiff and, during happier periods in the past, had employed as many as five or six carpenters. It is also true that, in the instant case, the trial court found the construction industry to be "seasonal," whereas the *Cooperman* court characterized the film industry as nonseasonal but "erratic." However, neither distinction appears to us to be of any real significance. ■ In our opinion, the true basis for the *Cooperman* decision consisted of the fact that the plaintiff's state of unemployment was a matter over which he had no control and one which was not a result of any deliberate decision to tailor the terms of his employment, and particularly his compensation, in such a way as to avail himself of unemployment compensation benefits to which he should not have been entitled. Thus, the *Cooperman* decision rests upon a determination that the plaintiff's state of employment was not the result of any fault of his own. We find such reasoning to be equally applicable in this instance.

Defendants assert that since plaintiff was president and a shareholder of Carlsen, Inc., he did have control over his own employment, since he possessed the power to compensate himself for his services as corporate president when he became unable to find work as a carpenter. Defendants reason that since the construction industry is seasonal, plaintiff had a duty to so control his wages as president that he would not find it necessary to apply for unemployment compensation benefits during the "off-season." Apparently, this reasoning was applied by the trial court, since it found that the construction industry was seasonal, and also concluded, in effect, that it was within plaintiff's power to "permit" the corporation to compensate him for his services. However, on the particular facts before us, we have concluded that this reasoning does not justify a denial of unemployment compensation benefits to plaintiff.

Insofar as it is contended that plaintiff could, at will, have paid himself a salary as corporate president, the record contains no evidence that he possessed such power. Although plaintiff was president of the corporation and he and his wife were the sole shareholders, the corporate by-laws are not a part of the record and the record likewise sheds no light on the number of shares of stock owned by plaintiff, as opposed to those owned by his wife. The record does reveal that when the original decision with regard to the compensation of the corporate officers was made, shortly after the corporation was formed, all three corporate officers participated in that decision; also, that it was the other two officers, rather than plaintiff, who were strongly of the opinion that he should not be compensated for his services as president.[4] Thus, it is not clear that plaintiff possessed the authority to unilaterally decide that he would be compensated by the corporation for his services as president.

In any event, we agree with plaintiff that, even if he did possess the power to compensate himself as president and thus render himself employed within the meaning of section 1252, his failure to do so would not render him ineligible for unemployment compensation benefits unless he lacked "good cause" for his decision. (*Zorrero* v. *Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855].) The record in this case contains nothing to suggest the absence of good cause for adhering to the established corporate policy of withholding

---

[4]Although the trial court, as above noted, found that the decision not to pay salaries to the corporate officers was made by plaintiff, "with the consent of the other corporate officers," the record furnishes no support for this finding. Plaintiff gave the only testimony on this issue, and he stated, "We had discussed this in the beginning . . . we did discuss this, my extra time, what I put into it and at that time they said 'no way. We are too small a business and the business won't be able to stand it.' "

salaries from corporate officers. It is obvious that the corporation possessed limited assets when it was formed, and for all that can be gleaned from the record, it seems likely that it was in no better financial position when plaintiff applied for unemployment compensation benefits. The record reveals only that the corporation was still in existence but that it no longer had any contracts or any construction workers in its employ. The record furnishes no basis for a finding that plaintiff lacked good cause for failing to compensate himself as corporate president, assuming that he possessed the power to do so.

Defendants rely upon the trial court's finding that the construction industry was seasonal. This finding can only have been based upon the court's judicial notice of facts of common knowledge (Evid. Code, § 452, subd. (g)), since there is no evidence in the record to support it. However, assuming the validity of the finding, this case does not present a situation where plaintiff had in the past engaged in the practice of compensating himself as corporate president during months when business was good and dispensing with such compensation during lean months. In fact, plaintiff testified that, during the entire nine and one-half years during which Carlsen, Inc., had been in existence, he had never filed a claim for unemployment compensation benefits because he always had work as a carpenter. Thus, the seasonal impact on Carlsen, Inc. would seem to have been nonexistent in the past. Certainly, the record demonstrates that plaintiff's present claim for unemployment compensation benefits was unconnected with the seasons. According to plaintiff, the claim was the result of a general lack of work for the construction industry in the area. Thus, we find that the cause of plaintiff's unemployment was not seasonal, but rather "erratic," as in the *Cooperman* case, where it was held that unemployment compensation benefits were improperly denied.

One final ground upon which the trial court may have based its decision deserves mention. The court found that plaintiff's duties "fully occupied [his] time inasmuch as he had to be prepared at all times to take appropriate action when the affairs of the corporation so required." ▇ It is arguable that this finding could be construed as a determination that plaintiff was not "available for work," within the meaning of section 1253, subdivision (c), due to the all-inclusive nature of his responsibilities as corporate president. If so, such finding is devoid of evidentiary support. Plaintiff testified that he was devoting two hours a week at the most to his duties as a corporate president. He further testified that, in the past, when he had been working fulltime as a carpenter, he had fulfilled his duties as corporate president during the

evenings and on weekends. There was no conflicting evidence on this issue. In *People* v. *Nest, supra,* at page 861, the claimant was devoting a substantially greater number of hours per week to the management of his clothing business, but the court nevertheless held that he was available for other work as a matter of law. The court stated, "[T]he Attorney General as *amicus curiae* strongly urges that the evidence establishes that defendant was not 'available for work.' With this we cannot agree. The only evidence in the record on the subject other than the defendant's part-time activities was his own testimony, which was somewhat corroborated, to the effect that during all that time (while self-employed) he continued his search for work elsewhere, that his presence at the store was not necessary, that he was physically able to work, that he registered for work with the California Department of Employment, and that he did not refuse an offer of suitable work. In the face of such testimony we find there was no substantial evidence to support the trial court's implied finding that the defendant was not 'available for work' during the period in question." (Pp. 861-862.) The *Nest* decision is clearly controlling on this point and establishes that the evidence in the instant case was insufficient as a matter of law to support a finding that plaintiff's parttime activities as the president of Carlsen, Inc., rendered him unavailable for other work.

The judgment is reversed, and in accordance with section 1094.5, subdivision (e), of the Code of Civil Procedure, the trial court is directed to remand the case to the California Unemployment Insurance Appeals Board for reconsideration, in light of the views we have expressed herein.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied January 5, 1977, and the judgment was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied February 23, 1977.